KEITH P. ELLISON, UNITED STATES DISTRICT JUDGE
Plaintiffs Quantlab Technologies Ltd. and Quantlab Financial, LLC ("Quantlab") filed a Motion for Attorneys' Fees and a Motion for Costs in 2015 against Defendants Andriy Kuharsky and Emmanuel Mamalakis. (Doc. No. 787, 788.) This Court deferred ruling on those motions pending an appeal of this case's merits by those defendants. In June 2017, the Fifth Circuit affirmed the jury verdict against them. Quantlab Tech., Ltd. (BVI) v. Kuharsky , 696 Fed.Appx. 682 (5th Cir. 2017). Quantlab has moved this Court to take up its pre-appeal motion for attorney fees, and it has filed an Amended Bill of Costs. (Doc. No. 869, 870.) Based on careful consideration of the filings and applicable law, Quantlab's motions are GRANTED .
I. BACKGROUND
This long-running dispute concerns the trade secrets of Quantlab, a firm that develops proprietary technologies for high-frequency trading. Its story has been told elsewhere. See, e.g., Quantlab , 696 Fed.Appx. at 684-91 ; Quantlab Tech. Ltd. v. Godlevsky , 2014 WL 651944 (S.D. Tex. Feb. 19, 2014). For present purposes, a few points suffice. The case began with six defendants: Vitaly Godlevsky, Andriy Kuharsky, Anna Maravina, Ping An, Emmanuel *947 Mamalakis, and SXP Analytics, LLC. All but Kuharsky and Mamalakis reached a stipulated judgment with Quantlab before trial. (Doc. No. 742-47.) Also before trial, the Court granted summary judgment to Quantlab on its claims for copyright infringement and breach of contract against Kuharsky and its claim for copyright infringement against Mamalakis. (Doc. No. 661.) Additionally, this Court granted a partially dispositive sanction against Kuharsky, declaring him liable for misappropriation of trade secrets as a sanction for his "bad faith, intentional spoliation of evidence." (Doc. No. 725 at 9.)
At trial, the jury found Kuharsky liable for conspiracy to misappropriate trade secrets, for knowingly inducing Defendant Anna Maravina to breach the fiduciary duty that she owed to Quantlab, and conspiracy to engage in that knowing inducement. (Doc. No. 761.) The jury also found Mamalakis liable for misappropriation of trade secrets and conspiracy to commit the same. (Id. ) It then awarded the following damages: $1.8 million for Kuharsky's misappropriation of trade secrets; $1.0 million for Mamalakis's misappropriation of trade secrets; $5.4 million for Kuharsky's conspiracy to misappropriate; and $4.0 million for Mamalakis's conspiracy to misappropriate. (Id. ) The Fifth Circuit affirmed the jury's verdict against the two defendants. Quantlab , 696 Fed.Appx. at 691.
Godlevsky, Kuharsky, and Mamalakis were the central figures in the scheme to misappropriate Quantlab's trade secrets, while the other defendants were peripheral or subordinate. From the start, the three main defendants engaged in litigation behavior so acrimonious, vexatious, and indefensible that their bad faith exceeds any that this judge has seen in his nineteen years on the bench.
It began even before the onset of this litigation. In 2007, Kuharsky represented to Quantlab, through counsel, that he possessed no documents or devices from Quantlab. (Doc. No. 302-2 at 9.) This turned out to be a flagrant lie. In 2009, within a few months of Quantlab's commencing this lawsuit, Mamalakis moved for sanctions under Rule 11 of the Federal Rules of Civil Procedure on the grounds that Quantlab's complaint revealed an inadequate factual basis for the suit. (Doc. No. 46.) This motion proved as meritless as Kuharsky's initial representations were untruthful. In their acrimony and mendacity, these initial acts were a sign of things to come. In the years that followed, Kuharsky and Mamalakis filed many more meritless motions that tied up the judicial process in taxing and time-consuming disputes.[1] Their vexatious conduct also necessitated extensive litigation by Quantlab throughout the discovery process.[2]
*948 Over the course of this case, it became clear that Kuharsky and Mamalakis not only were litigating irresponsibly and abusively, but also that they were working hard to put important evidence beyond Quantlab's reach. That conduct prompted this Court to impose sanctions on two occasions. In February 2014, the Court ruled that it would issue a spoliation instruction against Kuharsky, Mamalakis, and Godlevsky, finding that "[a] staggering amount of evidence ha[d] been lost." (Doc. No. 490 at 48.) On the basis of a two-day evidentiary hearing in late 2013, the Court found that Mamalakis had given away or erased the contents of numerous computers that would likely have shown the misappropriation of Quantlab's proprietary technology. (Id. at 23-31.) Mamalakis had also led Defendant SXP Analytics to file for bankruptcy in 2012 in an effort to defeat this Court's orders. (Id. at 26 n.8.) As for Kuharsky, the Court found that he had spoliated a large amount of electronic storage that he had the duty to preserve. (Id. at 36-44.) At the time, the Court expressed that this conduct was "deeply troubling." (Id. at 48.)
In April 2015, the Court sanctioned Kuharsky further. (Doc. No. 725.) Quantlab had demonstrated that Kuharsky had taken numerous steps to destroy incriminating evidence on a laptop that he was obligated to produce to Quantlab. (Id. at 7.) This spoliation was in direct violation not just of litigants' general duty to preserve and produce relevant evidence, but also of a specific order of this Court. (Id. at 7-8.) Consequently, the Court took the rare and draconian step of declaring Kuharsky liable for one of the claims against him. (Id. at 9.)
At many points in the bitter journey of this case, this Court exhorted the defendants to proceed in good faith and help the case toward its long-overdue resolution. Its exhortations went unheeded. Not one week after the Court imposed its partially dispositive sanction on Kuharsky, and only a few days before trial, Kuharsky thought it fit to seek the disqualification of Quantlab's counsel. (Doc. No. 741.) This motion, utterly meritless and contrary to this Court's many requests for more responsible behavior, exemplifies the conduct these defendants exhibited throughout this case's unnecessarily long history.[3]
II. LAW
Federal courts possess inherent power "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." Link v. Wabash R. Co. , 370 U.S. 626, 630-31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). "A primary aspect" of that power is "the ability to fashion an appropriate sanction for conduct which abuses the judicial process." Chambers v. NASCO, Inc. , 501 U.S. 32, 44-45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). One appropriate type of sanction is "an order ... instructing a party that has acted in bad faith to reimburse legal fees and costs incurred by the other side." Goodyear Tire & Rubber Co. v. Haeger , --- U.S. ----, 137 S.Ct. 1178, 1186, 197 L.Ed.2d 585 (2017). Such an order serves "the dual purpose of vindicating judicial authority *949 without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy." Chambers , 501 U.S. at 46, 111 S.Ct. 2123 (quotation omitted).
Such sanctions "must be compensatory rather than punitive in nature." Goodyear , 137 S.Ct. at 1186. Generally, "the fee award may go no further than to redress the wronged party for losses sustained." Id. (quotation omitted). There must ordinarily be "a causal link"-"appropriately framed as a but-for test"-"between the litigant's misbehavior and the legal fees paid by the opposing party." Id. at 1186-87. But in "exceptional cases," a district court can "shift all of a party's fees ... in one fell swoop." Id. In a case where "literally everything the defendant did-his 'entire course of conduct' throughout, and indeed preceding, the litigation-was 'part of a sordid scheme' to defeat a claim," a district court "could reasonably conclude that all legal expenses in the suit 'were caused ... solely by [the defendant's] fraudulent and brazenly unethical efforts." Id. at 1188 (quoting Chambers , 501 U.S. at 51, 57, 58, 111 S.Ct. 2123 ).
In calculating a fee award, district courts are not to "become green eye-shade accountants." Fox v. Vice , 563 U.S. 826, 838, 131 S.Ct. 2205, 180 L.Ed.2d 45 (2011). "The essential goal ... is to do rough justice, not to achieve auditing perfection." Id. Courts "may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." Id. They may decide "that all (or a set percentage) of a particular category of expenses ... were incurred solely because of a litigant's bad faith conduct." Goodyear , 137 S.Ct. at 1187.
III. ANALYSIS
Quantlab advances various theories that entitle it to a partial or full award of its fees and costs for litigating against Kuharsky and Mamalakis. (Doc. No. 787.) The Court need not consider each theory, because it finds that these defendants conducted the entirety of this litigation in such thoroughgoing bad faith that a full award under Chambers v. NASCO, Inc. is warranted.
Chambers was a suit for specific performance of a contract to sell a TV station's facilities and licenses. 501 U.S. at 35-36, 111 S.Ct. 2123. Shortly before the deal was to be consummated, Chambers, the seller, decided that he wanted out. Id. NASCO, the buyer, notified Chambers that it would be seeking a temporary restraining order to ensure specific performance. Id. This led Chambers to contrive a trust hastily, into which he moved the station's assets to put them out of reach. Id. In the long and agonizing litigation that followed, Chambers filed many "meritless motions," engaged in "delaying actions," was warned repeatedly, and eventually sanctioned and held in contempt. Id. at 37-38, 111 S.Ct. 2123. Chambers also took steps outside the courtroom to defeat the litigation. For instance, he sought authorization from the Federal Communications Commission to build a new transmission tower and relocate the station, so it would be beyond the original purchase agreement with NASCO. Id. at 38-39, 111 S.Ct. 2123.
The record of this case is a comparable catalogue of malfeasance. Kuharsky and Mamalakis's defenses never had merit. Indeed, as noted, Kuharsky based his initial defenses on total misrepresentations of the truth. Throughout the litigation, the two filed a stream of frivolous motions, much like Chambers, and undertook all manner of delaying actions to slow and sap the *950 judicial process. Again like Chambers, no number of warnings and even sanctions brought them in line with norms of litigation. They also took steps to defeat the litigation through indirect means: Kuharsky, through his extensive spoliation of electronic devices and storage; Mamalakis, through his effort to take SXP Analytics into bankruptcy; and much more.
The Supreme Court's recent decision in Goodyear instructed district courts to trace a but-for causal link between litigants' bad-faith behavior and opposing parties' litigation costs. The but-for test is to separate ordinary litigation costs that parties should expect to bear from extraordinary costs that they should not have to. In the present case, such lines cannot be drawn. The docket in this case exceeds 800 entries. As catalogued in this opinion's footnotes, an inordinate number of those docket entries stem from the many meritless motions that Kuharsky and Mamalakis filed or from the many discovery motions that Quantlab should not have had to file. Moreover, the costs of Kuharsky's and Mamalakis's bad-faith conduct are not limited to these many discovery motions. Their mendacity and obstinacy pervade the litigation of all issues in this case.
To be sure, all defendants, even those eventually and correctly found fully liable, are entitled to mount a vigorous defense. But this case-litigated actively for six years, now more than a decade removed from its underlying events-is not that. Rather, it is that exceptional case described by the Supreme Court in Goodyear : the case where "literally everything the defendant did-his 'entire course of conduct' throughout, and indeed preceding, the litigation-was 'part of a sordid scheme' to defeat a claim." 137 S.Ct. at 1188 (quoting Chambers , 501 U.S. at 51, 57, 111 S.Ct. 2123 ). The Supreme Court suggested there that, in such a case, a district court "could reasonably conclude that all legal expenses in the suit 'were caused ... solely by [the defendant's] fraudulent and brazenly unethical efforts.' " Id. (quoting Chambers , 501 U.S. at 58, 111 S.Ct. 2123 ). That is the conclusion this Court reaches here.
Quantlab documents all the attorney fees, expert fees, and costs that it paid in this matter from 2007 to 2017. It seeks a total of $9,999,527.03. As indicated in the affidavit of its General Counsel, Tim McInturf, Quantlab employed five law firms and one solo practitioner: Smyser Kaplan & Veselka; Littler Mendelson; Whyte Hirschboeck; the Spencer Law Firm; Hughes Waters Askanase; and Tim Headley. (Doc. No. 884 at 5.) Their accumulated fee was $8,047,876.14 through trial, and $268,744.67 through appeal, making a total of $8,334,620.81. (Id. at 5-6.) McInturf corroborates these figures with the attorneys' monthly invoices from the entire period, each of which includes detailed hourly entries. (Doc. No. 884-2.)
Quantlab also seeks the fees of its forensic analysts, AON Consulting and Pathway Forensics. (Doc. No. 884 at 7.) It requests $64,166.64 for AON and $1,321,405.15 for Pathway, making a total of $1,385,571.79. (Id. ) Quantlab justifies this substantial fee request with reference to the case's entire record, already discussed, and with an affidavit from Noel Kersh of Pathway Forensics. (Doc. No. 882.) Kersh, detailing Kuharsky's and Mamalakis's repeated bad acts, describes this as "the worst case of evidence destruction and the use of anti-forensics tools that I have ever encountered in my career." (Id. at 2.)
Finally, Quantlab seeks its costs. Its Amended Bill of Costs, filed in October 2017 after the conclusion of the appeal, totals $279,334.43. (Doc. No. 870-1.) The largest cost is "Copy, Printing, & Image Fees," followed by "Special Master *951 Fees,"[4] "Deposition & Transcript Fees," and similar expenses. (Id. ) Quantlab supports this bill of costs with spreadsheets that show each line item. (Doc. No. 870-2-870-7.) To corroborate each line item, Quantlab supplies scans or copies of each invoice. (Doc. No. 884-2.)
In crafting a sanction against Kuharsky and Mamalakis, the Court must determine whether Quantlab's attorney fees were reasonable. "The most useful starting point in determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley v. Eckerhart , 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). This is the "lodestar" method, adopted by the Supreme Court as "the centerpiece of attorney's fee awards." Blanchard v. Bergeron , 489 U.S. 87, 94, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). "There exists a strong presumption of the reasonableness of the lodestar amount." Saizan v. Delta Concrete Prods. Co., Inc. , 448 F.3d 795, 800 (5th Cir. 2006). After determining a reasonable hour total and hourly rate, "the court may decrease or enhance the amount based on the relative weights of the twelve factors set forth in Johnson ."[5] Id. (citing Johnson v. Ga. Highway Exp., Inc. , 488 F.2d 714, 717-19 (5th Cir. 1974), abrogated on other grounds by Blanchard , 489 U.S. 87, 109 S.Ct. 939 ).
Quantlab bears the "burden of showing the reasonableness of the hours billed." Saizan , 448 F.3d at 799. The reasonableness of this figure depends on "billing judgment," which turns on the existence of "sufficient documentation." Id. ; Gagnon v. United Technisource, Inc. , 607 F.3d 1036, 1044 (5th Cir. 2010) (quotation omitted). Quantlab has supplied voluminous documentation of its attorneys' time, which neither Kuharsky nor Mamalakis persuasively challenges. Kuharsky does not address the issue at all. (Doc. No. 800.) Mamalakis rehashes old arguments that the vexatiousness of this litigation is actually the fault of Quantlab, the prevailing party, not the defendants found liable by the jury and sanctionable by this Court. (Doc. No. 799.) Based on a review of the case's record and Quantlab's supporting documentation, the Court finds that Quantlab's counsel exercised adequate billing judgment, such that their hour totals are reasonable.
"When an attorney's customary billing rate is the rate at which the attorney requests the lodestar be computed and that rate is within the range of prevailing market rates, the court should consider this rate when fixing the hourly rate to be allowed. When that rate is not contested, it is prima facie reasonable." La. Power & Light Co. v. Kellstrom , 50 F.3d 319, 328 (5th Cir. 1995) (quotation omitted). McInturf, *952 Quantlab's General Counsel, provides the hourly rates and professional biographies of Quantlab's outside counsel. (Doc. No. 884 at 6-7.) Kuharsky and Mamalakis do not challenge these figures, making them prima facie reasonable. In view of these attorneys' experience and performance, as well as this Court's knowledge of the Houston legal market, the Court concludes that the hourly rates are reasonable.
Finally, consideration of the Johnson factors confirms the Court's conclusion that Quantlab's requested fees are reasonable. Quantlab's outside counsel exercised diligence and skill in the litigation of a difficult, complex case that spanned many years and yielded a successful result for their client.
Quantlab also requests the entirety of the fees it paid to its forensic experts, AON and Pathway. These forensic analysts were essential to the litigation of this case. The case concerned the misappropriation of trade secrets, making the analysis of computers and other electronic storage devices central to its resolution. The case also saw significant and continuing spoliation of important evidence, necessitating the intensive involvement of forensic experts. In such cases, courts have considered the recovery of forensic expert fees to be an appropriate part of sanctions. See, e.g., CAT3, LLC v. Black Lineage, Inc. , 164 F.Supp.3d 488, 499-501 (S.D.N.Y. 2016) ; E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc. , 803 F.Supp.2d 469, 509-10 (E.D. Va. 2011) ; Trigon Ins. Co. v. U.S. , 204 F.R.D. 277, 291 n.11 (E.D. Va. 2001). Kuharsky and Mamalakis make no specific challenge to an award of Quantlab's forensic expert fees. The Court finds that an award is warranted.
The Court cannot, however, award the full sum of fees and costs that Quantlab requests. It asks for all its expenses, but Kuharsky and Mamalakis were not the only defendants. The sense of the Court is that Ping An, Anna Maravina, and SXP Analytics, LLC were not significant actors in their own right, whereas Kuharsky, Mamalakis, and Godlevsky were, in roughly equal proportion to one another. In the Court's estimation, Kuharsky, Mamalakis, and Godlevsky each accounted for 30% of the overall litigation expense, with the other defendants accounting for the remaining 10%, until Quantlab reached stipulated judgments with most of the defendants. From then on, Kuharsky and Mamalakis accounted for an equal share of Quantlab's litigation expense.
The stipulated judgments against the other defendants occurred at the beginning of May 2015. Accordingly, the Court uses the first day of that month as the marker of the case's two distinct phases. From May 2015 onward, Quantlab's invoices show attorney fees of $931,834.27 and expert fees of $118,104.65. (Doc. No. 884-1.) Its bill of costs shows $51,795.64 from the start of May 2015. (Doc. No. 870-2-870-7.) Kuharsky and Mamalakis shall each be responsible for half of those sums and 30% of the sums preceding May 2015. The resulting total is $3,220,205 each for Kuharsky and Mamalakis.
The Fifth Circuit has explained that the inherent power to sanction litigants "is not a broad reservoir of power, ready at an imperial hand, but a limited source." NASCO, Inc. v. Calcasieu Television & Radio, Inc. , 894 F.2d 696, 702 (5th Cir. 1990), aff'd sub nom. Chambers v. NASCO, Inc. , 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). Accordingly, it has cautioned district courts that "the imposition of sanctions under the court's inherent power is powerful medicine that should be administered with great restraint."
*953 Union Pump Co. v. Centrifugal Tech. Inc. , 404 Fed.Appx. 899, 906 (5th Cir. 2010). The Court worked to exercise that restraint here, denying Quantlab's first sanctions request (minute entry, 3/13/2012), denying Quantlab's first request for litigation-ending sanctions (Doc. No. 490), and only imposing such sanctions after continued defiance of court orders (Doc. No. 725). Mindful of the need for judicial restraint, the Court nevertheless concludes that the requested sanction is appropriate.
IV. CONCLUSION
Our legal system is meant to provide a "just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. This case fell far short of those commonsense aims. That failure owed not, however, to the poor design of the Federal Rules or to some other deficiency of process, but to the incapacity of Defendants Andriy Kuharsky and Emmanuel Mamalakis to conduct themselves with any measure of honesty, responsibility, or good faith. Accordingly, the Court GRANTS Quantlab's Motion for Consideration of its Pre-Appeal Motions (Doc. No. 869), and it GRANTS Quantlab's Motion for Attorneys' Fees and Motion for Costs (Doc. No. 787, 788.) Kuharsky and Mamalakis shall each pay Quantlab the sum of $3,220,205.
IT IS SO ORDERED .

An incomplete list includes Mamalakis's Motion for Protective Order of February 1, 2012 (Doc. No. 132); Mamalakis's Motion to Compel of February 6, 2012 (Doc. No. 133); Mamalakis's Motion in Limine of April 10, 2012 (Doc. No. 198); Kuharsky's Motion to Compel of May 5, 2012 (Doc. No. 211); Kuharsky's Motion to Compel of May 12, 2012 (Doc. No. 215); Kuharsky's Motion to Sever Claims of March 20, 2013 (Doc. No. 279); Kuharsky's Motion to Compel of March 27, 2013 (Doc. No. 297); Kuharsky's Motion to Modify of July 26, 2013 (Doc. No. 385); Mamalakis's Motion to Quash of October 18, 2013 (Doc. No. 435); Kuharsky's Motion to Compel of June 30, 2014 (Doc. No. 522); Kuharsky's Motion to Compel and Motion for Clarification of February 2, 2015 (Doc. No. 663, 664); Kuharsky's Motion to Disqualify Counsel of May 1, 2015 (Doc. No. 741); and more.

A partial accounting includes Quantlab's Motion for Protective Order and for Sanctions of March 1, 2012 (Doc. No. 152); its Motion to Compel of March 7, 2012 (Doc. No. 158); its Motion to Compel of March 29, 2013 (Doc. No. 302); its Motion to Compel of May 1, 2013 (Doc. No. 334); its Motion to Overrule Objections of May 7, 2013 (Doc. No. 336); its Motion to Compel of June 28, 2013 (Doc. No. 360); its Motion to Compel of July 3, 2013 (Doc. No. 364); its Motion to Compel of September 6, 2013 (Doc. No. 398); its Motion to Compel of April 22, 2014 (Doc. No. 501); its Motion to Strike of December 29, 2014 (Doc. No. 639); and more.

One aspect of the case continues to puzzle the Court. The attorneys who have represented these defendants at different times are known to the Court from other contexts, where they have always conducted themselves professionally. The Court can only conclude that, in this proceeding, clients were not following the instructions of counsel.

The Court had appointed a special master in the early stages of this litigation. The special master handled evidentiary issues arising from an FBI raid in 2008 that seized many documents and items in the defendants' possession. (Doc. No. 244.)

Those factors are:
(1) the time and labor required to represent the client or clients; (2) the novelty and difficulty of the issues in the case; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney; (5) the customary fee charged for those services in the relevant community; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.
Saizan , 448 F.3d at 800 n.18 (quoting Johnson , 488 F.2d at 717-19 ).